UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| M. L. A., <br><br>                Plaintiff, <br><br>        v. <br><br> M. JEFFREY MAISELS, <br><br>                Defendant. | Case No. 21-cv-08121-VKD <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** <br><br> Re: Dkt. No. 10 |

Plaintiff M.L.A., a minor, by and through his guardian ad litem, asserts a single claim for negligent undertaking against defendant M. Jeffrey Maisels, M.D. Dkt. No. 3. The action was removed from state court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a).[1] Dkt. No. 1.

Dr. Maisels moves to dismiss plaintiff's first amended complaint ("FAC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 10. The Court heard oral argument on the motion on December 21, 2021. Dkt. No. 19. Having considered the parties' submissions and the arguments made at the hearing, the Court grants defendant's motion to dismiss the FAC with leave to amend.

I.   **BACKGROUND**[2]

M.L.A. was born in December 2017 at the Salinas Valley Hospital Medical Center. Dkt.

---

[1] The parties have consented to magistrate judge jurisdiction. Dkt. Nos. 8, 12. The parties do not otherwise dispute the Court's jurisdiction.

[2] Unless otherwise noted, the following factual allegations are taken from the FAC and from documents that are incorporated by reference in the FAC or that are the subject of judicial notice.

No. 3 ¶¶ 1, 2. While he was still in the hospital, M.L.A. was determined to be at high risk for developing hyperbilirubinemia, or excessive levels of bilirubin in the blood. *Id.* ¶ 14. If untreated, hyperbilirubinemia can lead to a condition called kernicterus, a type of brain damage. *Id.* ¶ 16 & n.1.

At some point before M.L.A.'s birth, the American Academy of Pediatrics ("AAP") convened a committee to investigate an increase in cases of hyperbilirubinemia and brain injury in newborns believed to be the result of newborns being discharged from hospitals less than 48 hours after birth. *Id.* ¶ 4. According to M.L.A., the AAP is a "national organization of pediatricians whose primary purpose is to advance the educational level for pediatrician members on specific medical issues and ultimately to improve the quality of medical care for newborn babies in the U.S." *Id.* ¶ 5.

In July 2004, the AAP Subcommittee on Hyperbilirubinemia prepared and published a clinical practice guideline called "Management of Hyperbilirubinemia in the Newborn Infant 35 or more weeks of Gestation" ("the Guideline"). *Id.* ¶ 6. Dr. Maisels chaired the subcommittee and co-authored the Guideline. *Id.* The Guideline was published in the Journal of Pediatrics, the official publication of the AAP, and was sent to all pediatrician members of the AAP in the United States, including California. *Id.* The Guideline included "charts with recommendations for follow-up care after a bilirubin level was obtained after birth, a chart to determine if phototherapy was recommended for age-specific bilirubin levels[,] and a chart to determine if exchange blood transfusion was recommended for age-specific bilirubin level." *Id.* ¶ 8. According to M.L.A., the Guideline did not state that "the chart for follow-up of a bilirubin level cannot be used after a baby has received phototherapy." *Id.* ¶ 9.

In February 2008, Dr. Maisels published a paper titled "Phototherapy for Neonatal Jaundice" in the New England Journal of Medicine. *Id.* ¶ 11. This paper included the following statement: "for infants who require phototherapy during their birth hospitalization, a follow-up bilirubin level should be obtained 24 hours after discharge." *Id.*

In October 2009, the AAP Subcommittee on Hyperbilirubinemia, which was still chaired by Dr. Maisels, published "Hyperbilirubinemia in the Newborn Infant 35 or more weeks of

Gestation: An update with clarifications" in the Journal of Pediatrics. *Id.* ¶ 10. According to M.L.A., the 2009 update to the Guideline did not include the recommendation that infants who require phototherapy during their birth hospitalization should have a follow-up bilirubin test 24 hours after discharge, and it also did not "clarify why the Bhutani curve/chart[3] for follow-up based on age specific bilirubin levels cannot be used after phototherapy." *Id.* ¶ 12.

At 23 hours after birth, M.L.A. had a bilirubin level of 8.8. *Id.* ¶ 14. His treating pediatrician, Dr. Heidi Deyro, treated M.L.A with phototherapy. *Id.* At 36 hours after birth, M.L.A. had a bilirubin level of 8.5. *Id.* ¶ 15. According to M.L.A., "the Bhutani curve showed a bilirubin of 8.5 to be in the low intermediate zone, and based on that information, Dr. Deyro and the nurses, in conformity with the recommendations of the AAP [updated Guideline], ordered that M.L.A. be seen in a pediatric clinic for follow-up in 2 days." *Id.* As it happened, M.L.A. was not seen in a pediatric clinic, but was readmitted to the hospital on the third day after discharge with a bilirubin level of 41.4. *Id.* ¶ 16. He was subsequently diagnosed with kernicterus. *Id.*

In December 2018, M.L.A. filed an action for medical malpractice in state court against the Salinas Valley Memorial Hospital and Dr. Deyro, as well as other others. *Id.* ¶¶ 2, 17. In March 2021, Dr. Maisels testified in a deposition in that action as an expert witness for the defense. *Id.* ¶ 7. During his deposition, Dr. Maisels was asked: "[W]ould you disagree with experts who say that at 36 hours of age the baby should have either been kept in the hospital for further evaluation, observation, and a further bilirubin level or returned to the hospital within 24 hours for a further bilirubin level?" *Id.* ¶ 18. According to M.L.A., Dr. Maisels answered as follows:

> I don't disagree with any of that. If I was taking care of this baby that is almost certainly what I would have done. Dr. Deyro misinterpreted, unfortunately, the follow-up issues that were laid out in the 2009 guideline, which says that if a baby of this gestation and with these kinds of risk factors has a bilirubin level that is in the low-intermediate zone, the follow-up recommendation[*sic*] are return in two days and consider getting a transcutaneous or a serum bilirubin level. . . .

---

[3] According to M.L.A., the Bhutani curve/chart "places the neonate into specific risk categories, which then determines follow-up. . . . [It] divides babies into a high risk zone, a high intermediate risk zone, a low intermediate risk zone, and a low risk zone, depending on their bilirubin level at specific hours of age after birth." *Id.* ¶ 13.

> Now it is true that those guidelines don't specify that this does not apply to a baby who has received phototherapy. [Plaintiff's expert] recognizes that as well and he says that it is not written anywhere, and he is correct. Nowhere is it written, unfortunately, and I accept some responsibility for this because I was the author of both of those guidelines together with other people who wrote it. We should have specified that any baby who received phototherapy is not part of this follow-up guideline, that they have to be taken into and considered in another category. . . .
>
> So, unfortunately, and it is not as [Plaintiff's expert] said in his deposition, common knowledge. It is not common knowledge that phototherapy doesn't apply. If it was common knowledge, Dr. Deyro would not have done it. It is not common knowledge. I can assure you that that is misinterpreted by many pediatricians in this case. . . .

*Id.* ¶¶ 19-21.

M.L.A. alleges that Dr. Maisels's failure to "clarify in the [updated AAP Guideline] that when a baby undergoes phototherapy during their birth hospitalization, [they] should return for a follow-up bilirubin within 24 hours after discharge, regardless of what risk zone they are in after phototherapy, led directly to the nurses at Salinas Valley Hospital Medical Center and Dr. Deyro to fail to have M.L.A. return to the hospital 23 hours after discharge for a follow-up bilirubin." *Id.* ¶ 22. He alleges that Dr. Maisels negligently undertook to render services to Dr. Deyro and the hospital's nurses in publishing and failing to clarify the updated Guideline. *Id.* ¶ 24.

## II.  LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those

4

conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678.

A court generally may not consider any material beyond the pleadings when ruling on a Rule 12(b)(6) motion. Documents appended to the complaint, incorporated by reference in the complaint, or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 889 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

### III. DISCUSSION

Dr. Maisels moves to dismiss M.L.A.'s single claim for negligent undertaking for failure to state a claim under Rule 12(b)(6). First, Dr. Maisels argues that California Civil Code § 47(b), informally known as the "witness litigation privilege," immunizes him from liability. Dkt. No. 10 at 5–7. Second, Dr. Maisels argues that M.L.A. fails to plead facts sufficient to state a claim for negligent undertaking. *Id.* at 7–9. The Court addresses each argument.

#### A.   Immunity Under California Civil Code § 47(b)

Citing California Civil Code § 47(b), Dr. Maisels argues that he is immune from any liability because M.L.A.'s claim is based on his privileged deposition testimony. Dkt. No. 10 at 5–7. The "litigation privilege" codified in Civil Code § 47(b) applies to a communication required or permitted by law in the court of a judicial proceeding to achieve the objects of the litigation. Cal. Civ. Code § 47(b); *Rusheen v. Cohen*, 37 Cal.4th 1048, 1057 (2006) (citing *Silberg v.*

*Anderson*, 50 Cal. 3d 205, 212 (1990)).

While statements made by a witness during a deposition are privileged communications, *see* Cal. Civ. Code § 47(b)(3); *see also Moore v. Conliffe*, 7 Cal. 4th 634, 640–53 (1994) (medical expert's deposition testimony in connection with private, contractual arbitration proceeding was absolutely privileged), Civil Code § 47(b) affords Dr. Maisels no immunity here. M.L.A. does not claim that Dr. Maisels was negligent in providing testimony as an expert witness in the state court medical malpractice action; rather, the alleged negligent undertaking is Dr. Maisels's failure to provide accurate guidelines for the treatment of hyperbilirubinemia as chair of the AAP Subcommittee responsible for formulating and publishing such guidelines. *See* Dkt. No. 13 at 2 ("[T]he basis of the claim by Plaintiff in this case is not what Dr. Maisels said during his deposition, rather the basis of the claim is what [Dr. Maisels] failed to do during the drafting of the guidelines, and subsequent revision."). Dr. Maisels's deposition testimony may or may not be admissible evidence of the alleged negligence, but it is not the basis for M.L.A.'s claim.

**B.     Failure to State a Claim for Negligent Undertaking**

To state a claim for negligent undertaking, M.L.A. must plead the following elements:

(1) Dr. Maisels undertook, gratuitously or for consideration, to render services to another;

(2) The services rendered were of a kind Dr. Maisels should have recognized as necessary for the protection of M.L.A.;

(3) Dr. Maisels failed to exercise reasonable care in the performance of this undertaking;

(4) The failure to exercise reasonable care resulted in physical harm to M.L.A.; and

(5) Either (a) Dr. Maisels's failure to exercise reasonable care increased the risk of such harm, or (b) he undertook to perform a duty owed by another to M.L.A., or (c) the harm was suffered because of reliance by another or by M.L.A. upon the undertaking. *See Artiglio v. Corning, Inc.*, 18 Cal. 4th 604, 612–13 (1998) (quoting Section 324A of the Restatement (Second) of Torts).

Dr. Maisels challenges M.L.A.'s complaint on two grounds.[4] First, he argues that the

---

[4] Dr. Maisels includes additional arguments in his reply brief, including arguments on the merits, some of which rely on quotes from the updated Guideline—a document that is not in the record

complaint does not allege that Dr. Maisels undertook to render services to Dr. Deyro, M.L.A.'s treating physician, and that such an allegation could not plausibly be made based solely on the publication of the AAP Guideline. Dkt. No. 10 at 8–9. As discussed above, the alleged negligent undertaking is Dr. Maisels's failure to provide accurate guidelines for the treatment of hyperbilirubinemia as chair of the AAP Subcommittee responsible for formulating and publishing such guidelines. The complaint alleges that the updated Guideline was sent to "all pediatrician members of the AAP in the U.S." Dkt. No. 3 ¶ 6. While it may reasonably be inferred from these allegations that Dr. Maisels and the AAP Subcommittee intended to communicate the treatment guidelines to all member pediatricians, the complaint does not allege that Dr. Deyro was among those pediatricians. The complaint does not describe any other manner in which Dr. Maisels allegedly rendered services to Dr. Deyro. For this reason, the Court agrees that the complaint fails to plead the first element of a claim for negligent undertaking.

The more difficult question is whether formulation and publication of the AAP guidelines can ever be an actionable undertaking. The complaint describes the AAP's mission as "educational," but does not explain the guidelines' role in the treatment decisions of pediatricians like Dr. Deyro. *Id.* ¶ 5. Dr. Maisels cites no authority for his position that the publication of treatment guidelines by a national organization of pediatricians cannot, as a matter of law, constitute an undertaking, and that proposition certainly is not self-evident. *See, e.g., Mayall v. USA Water Polo, Inc.*, 909 F.3d 1055, 1067–68 (9th Cir. 2018) (reversing district court's dismissal of complaint where plaintiff alleged defendant undertook "specific responsibility to establish and enforce rules to ensure the safety of athletes in its youth water polo league"); *Deya v. Hiawatha Hosp. Ass'n, Inc.*, No. 10-CV-2263-JAR/GLR, 2011 WL 1698774, at *2–3 (D. Kan. May 4, 2011) (permitting amendment to add negligent undertaking claim against hospital administrator responsible for "reviewing, developing and initiating written policies and protocols for newborn care"). The question turns, in part, on the nature of the undertaking. *See, e.g.*, *Hardin v. PDX, Inc.,* 227 Cal. App. 4th 159, 169 (2014) ("[I]t is the nature of PDX's undertaking, not the care with

---

before the Court. The Court will not consider arguments raised for the first time in a reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

1 which it was carried out, that determines whether it assumed a duty under Restatement section
2 324A in the first place."). Accordingly, because the complaint fails to adequately allege the nature
3 of the undertaking at issue, the Court concludes that the complaint fails to plead the first element
4 of a claim for negligent undertaking.

5       Second, Dr. Maisels argues that the complaint does not adequately allege causation
6 because M.L.A. does not allege that Dr. Deyro relied in any way on the updated Guideline in
7 treating M.L.A. Dkt. No. 10 at 9; Dkt. No. 14 at 3. In his opposition brief, M.L.A. responds that
8 "[e]ven if Dr. Deyro had [not] read the guideline prior to making her clinical decision, Dr. Deyro's
9 decision was based on the standard of care," which "in major part, was based on the [updated
10 Guideline]." Dkt. No. 13 at 9. However, these allegations are not found anywhere in the
11 complaint, which is otherwise silent regarding Dr. Deyro's knowledge of or reliance on the AAP
12 guidelines. For this reason, the Court agrees with Dr. Maisels that the complaint fails to plead the
13 fourth element of a claim for negligent undertaking.

14       Accordingly, the Court finds that M.L.A.'s complaint fails to state a claim for negligent
15 undertaking against Dr. Maisels.

## IV. LEAVE TO AMEND

While leave to amend is generally granted liberally, the Court has discretion to dismiss a claim without leave to amend if amendment would be futile. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1197 (N.D. Cal. 2010) (citing *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996)). Because the Court does not find that amendment would be futile, the Court grants M.L.A. leave to amend.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss. Plaintiff may file an amended complaint by **January 24, 2022**. The Court continues the initial case management conference to **March 1, 2022**.

//

//

**IT IS SO ORDERED.**

Dated: January 10, 2022

*Virginia K. DeMarchi*
VIRGINIA K. DEMARCHI
United States Magistrate Judge